IN the MATTER OF the ARBITRATION BETWEEN:

EMPLOYERS INSURANCE OF WAUSAU, a Mutual Company,
Petitioner-Respondent,

v.

Robin A. G. JACKSON, an Underwriter at Lloyd's,
London, on his own behalf and as Representative
Underwriter Certain Underwriters at Lloyd's, London
and Certain London Market Insurance Companies,
Respondents-Appellants-Petitioners.†

Supreme Court

*No. 93–0354. Oral argument October 11, 1994.—Decided
February 28, 1995.*

(Also reported in 527 N.W.2d 681.)

†Motion for reconsideration denied April 18, 1995.

598

600

For the respondents-appellants-petitioners there were briefs by *William D. Mollway* and *DeWitt, Porter, Huggett, Schumacher & Morgan, S.C.,* Madison and *R. R. McMahan, Robert A. Knuti, Jane H. Veldman* and *Lord, Bissell & Brook,* Chicago, IL and oral argument by *Jon P. Axelrod* and *R. R. McMahan.*

For the petitioner-respondent there was a brief by *Timothy J. Muldowney, Jeffrey J. Kassell* and *LaFollette & Sinykin,* and *Dale I. Larson, Timothy W. Regan* and *Zelle & Larson,* Minneapolis, MN and oral argument by *Timothy J. Muldowney* and *Dale I. Larson.*

WILCOX, J. This is a review of a published decision of the court of appeals, *Employers Ins. of Wausau v. Jackson,* 178 Wis. 2d 755, 505 N.W.2d 147 (Ct. App. 1993). The court of appeals affirmed an order of the circuit court for Marathon County, Raymond F. Thums presiding, which confirmed the naming of two arbitrators by Employers Insurance of Wausau (Wausau) in an arbitration proceeding initiated by Wausau against certain underwriters at Lloyd's of London (Lloyd's).[1] The parties raise several issues for our consideration, but the overriding issue can be summarized as follows: Whether a circuit court has the authority, pursuant to the Wisconsin Arbitration Act, to confirm the appointment of an arbitrator in accordance with the terms of the applicable arbitration agreement when the parties themselves have reached a deadlock that is preventing successful arbitration of the underlying dispute. We conclude that the circuit courts have this authority

---

[1] The Lloyd's underwriters engage in the underwriting of insurance and reinsurance risks through syndicates, approximately fifty of which are involved here. The insurance companies, of which there are twenty-five, are variously domiciled in the United States, England, France, Switzerland, Portugal, Italy, Brazil, Scotland, Turkey, Japan and Germany. Robin A.G. Jackson is a member of one of the underwriting syndicates who was authorized following the filing of this suit to act as representative for all of the interested reinsurers who appeared in the circuit court. Three of the companies have never appeared in this action and are not represented by Jackson.

and, therefore, we affirm the decision of the court of appeals.

Beginning in 1966, Wausau and Lloyd's entered into a series of contracts called "excess retrocessional insurance treaties." Under these treaties, Lloyd's reinsured reinsurance contracts issued by Wausau's professional reinsurance department to other insurance companies.[2] Wausau employed a New York broker, Pritchard & Baird, Inc., which in turn engaged a London broker, Leslie & Godwin, Ltd., to act as intermediaries for the negotiating and drafting of the terms of the agreements. In this regard, the language of the agreement provides: "Pritchard & Baird, Inc., . . . are hereby recognized as the intermediary negotiating this Agreement and through whom all communications and transactions relating thereto shall be transmitted to both parties." At issue in the present case are treaties in force between Lloyd's and Wausau for the period July 1, 1966, to June 30, 1973.

In the mid-1970's, the deleterious effects of asbestos began to be publicized. Consequently, personal injury litigation surrounding asbestos became preva-

---

[2] This type of insurance is known as a "retrocession." Generally described, a retrocession is where one reinsurer assumes the reinsurance obligations already assumed by another reinsurer. The general concept of reinsurance grew out of insurers' desires to avoid turning away potentially large clients but to avoid the dangers of unexpectedly large, unforeseen liabilities. An insurer can accept a potentially large-risk coverage, but then reduce its exposure by "reinsuring" some part of it. In turn, a reinsurer can then reduce its potential risk by reinsuring the reinsurance that it has accepted and so on. The number of retrocessions is essentially unlimited. For an overview of the concept of reinsurance see Charles F. Corcoran, III, *Reinsurance Litigation: A Primer*, 16 W. NEW ENG. L. REV. 41 (1994).

lent during this time. In 1981, Wausau began settling and paying asbestos-related indemnity claims made against the reinsurance policies that it had issued to a variety of other insurance companies. Beginning in November 1984, Wausau submitted proofs of loss under its reinsurance agreement with Lloyd's to Leslie & Godwin, Ltd. (Pritchard & Baird was now defunct) and Lloyd's law firm, Lord, Bissell & Brook. Pursuant to the agreement, Lloyd's exercised its rights to perform an audit of Wausau's payment of the asbestos-related claims. The audit spanned a period of four years and was performed by Lord, Bissell & Brook under the supervision of its counsel, Thomas Dempsey.

In 1988, Wausau requested that Lloyd's either pay or deny the claims that had been submitted. Lloyd's denied the claims through a letter drafted by Dempsey on August 22, 1988. The relevant portions of the letter state:

> We have previously advised you that *this firm represents the interests of the London Excess of Loss Retrocessional Reinsurers [Lloyd's]* who entered into the above-captioned July 1, 1966 through June 30, 1976 Reinsurance Agreements with your company through Leslie & Godwin Reinsurance, Ltd. in London.
>
> The Wausau Insurance Companies have notified the London Retrocessional Reinsurers of potential losses arising out of its participation with various insureds who are named in the asbestos-related bodily injury litigation. We have also received Proofs of Loss from Wausau requesting reimbursement for asbestos-related loss payments . . ..
>
> . . ..
> We have conferred frequently with your Company and have investigated these Proofs of Loss. We

have also met with you and Mr. Sauer and Ms. Allington of your office. We believe it [is] clear that the Proofs of Loss were calculated by combining all asbestos-related losses sustained by any one Assured during a policy period and that no one original individual loss has been paid which exceeds the applicable treaty retention.

We must advise that the London Retrocessional Reinsurers have instructed this firm to refuse to accept the Proofs of Loss . . ..

Emphasis added.

The parties continued to discuss the matter for approximately two years when, by letter dated May 27, 1991, Wausau sent Lord, Bissell & Brook a letter demanding arbitration. The reinsurance treaty provides that any dispute or difference must be resolved by arbitration:

ARBITRATION:

If any dispute or difference of opinion shall arise with reference to the interpretation of this Agreement or the rights with respect to any transaction involved, the dispute shall be referred to three arbitrators, who shall be executive officers of insurance companies domiciled in the U.S.A., one to be chosen by the Company, one to be chosen by the Retrocessionaire, and the third by the two arbitrators so chosen within 30 days of their appointment. If either party refuses or neglects to appoint an arbitrator within 30 days after the receipt of written notice from the other party requesting it to do so, the requesting party may nominate two arbitrators, who shall choose the third. Each party shall submit its case to the arbitrators within 30 days of the appointment of the arbitrators. The arbitrators shall consider this Agreement an honorable engagement rather than merely a legal obligation; they are

relieved of all judicial formalities and may abstain from following the strict rules of law. The decision of a majority of the arbitrators shall be final and binding on both parties. The expense of the arbitrators and of the arbitration shall be equally divided between each party. Any such arbitration shall take place in Wausau, Wisconsin, unless some other location is mutually agreed upon.

In its May 27 letter, Wausau designated William J. Fox as its party arbitrator. Lord, Bissell & Brook acknowledged receiving this letter on June 6, 1991.

On June 13, 1991, Lord, Bissell & Brook advised Wausau that it "does not have any authority to accept notice on behalf of [Lloyd's]." Lord, Bissell & Brook further advised that it would forward the May 27 letter to the London broker of Leslie & Godwin with a request that it circulate Wausau's notice of arbitration to the various Lloyd's syndicates. Finally, Lord, Bissell & Brook asserted that "the 30 day period would begin running once the London Broker has notified all of the London participants." On June 20, 1991, Wausau responded that Lord, Bissell & Brook "has acted with both express and apparent authority concerning the denial of Wausau claims. Moreover, throughout all the years since your firm's involvement in 1984, you have never before communicated to your clients or Wausau through Leslie and Godwin." Wausau then reiterated its position that Lord, Bissell & Brook designate a party arbitrator within 30 days from Wausau's original request for arbitration.

Informal conversations concerning the arbitrator designation occurred over the next several weeks. No agreement was expressly reached, but on July 22, Lord, Bissell & Brook wrote to Wausau that Lloyd's had designated Robert F. Hall as its party arbitrator.

Two days later, Wausau drafted a letter to Lord, Bissell & Brook which states: "[Lloyd's] belated attempt at designation before you reached agreement with Wausau is untimely and the individual is unqualified." Pursuant to its belief that the "adverse selection" clause of the arbitration agreement became operative, Wausau designated Bradford W. Mitchell as Lloyd's party arbitrator. Lloyd's objected to the adverse designation and refused to proceed with the arbitration.

In August 1991, Wausau filed an action with the circuit court requesting that the court compel arbitration and confirm the appointment of Fox and Mitchell as the respective party arbitrators. In its response to the petition, Lloyd's contended that the circuit court did not have authority under the governing statutes to entertain the questions of timeliness, forfeiture and arbitrator qualifications raised by Wausau. Lloyd's further contended that, in any event, it had not forfeited the right to name an arbitrator and that the arbitrator that it had named was qualified to serve. After two unsuccessful attempts to remove the case to federal court, the circuit court set the case for a hearing on June 26, 1992.[3] During the hearing, the circuit court

---

[3] The question of removal of the case to federal court was eventually decided by the Seventh Circuit Court of Appeals in *Matter of Amoco Petroleum Additives Co.,* 964 F.2d 706 (7th Cir. 1992). There, Judge Easterbrook chastised Lloyd's for its dilatory tactics:

> Instead of seeking immediate review of the first order remanding the case, [Lloyd's] tried again in the district court and then came here. *They seem fixed on prolonging rather than resolving this contest.* It is time to get down to the merits. Wisconsin will decide the meaning of the treaties; interpretation of contracts is a staple of business in state courts. [Lloyd's] do not contend that Wisconsin disfavors arbitration or that any other doctrine or practice used there would inhibit prompt and accurate resolution of the parties'

607

fostered a compromise plan—Lloyd's would name its own arbitrator. The conditions were that the individual be named within one week, be qualified, be available for a deposition by Wausau shortly thereafter and be an individual other than Hall.

Shortly after the hearing, Lloyd's named Richard S. King as its new party arbitrator. King was deposed by Wausau on July 22, 1991. By letter dated July 29, 1991, Wausau wrote to the circuit court that it was rejecting King as arbitrator for Lloyd's. Consequently, the matter was still unresolved and arbitration was again placed on hold. Several months later, the circuit court issued a memorandum opinion in which it found that the designation of Hall "is clearly outside the 30 day requirement" of the arbitration agreement. The court declined, however, to consider whether Lord, Bissell & Brook was an agent of Lloyd's for the purposes of accepting notification of arbitration. The circuit court then concluded that Hall was not a qualified arbitrator within the meaning of the agreement. Based on this conclusion, the court ordered that arbitration proceed and confirmed Fox and Mitchell as the party arbitrators.

Lloyd's subsequently filed a motion for reconsideration or clarification with the circuit court. The circuit court held a second hearing on December 23, 1992. At the close of this hearing, the circuit court supplemented its memorandum opinion with two additional findings: (1) the 30-day period was "of the essence" of the agreement; and (2) Lord, Bissell & Brook was Lloyd's agent for purposes of receiving Wausau's request for arbitration and consequently the 30-day

dispute. Eight months of litigation about where to litigate is plenty. The petition for a writ of mandamus is denied.

*Id.* at 713 (emphasis added).

period for naming an arbitrator began to run from the point in time when Lord, Bissell & Brook received notice of Wausau's request for arbitration. The circuit court thus reaffirmed its earlier opinion that: (1) it had the power, pursuant to secs. 788.03 and 788.04, STATS., to compel arbitration; (2) Lloyd's failed to name a qualified arbitrator within the parameters of the arbitration agreement; and (3) there had been a "lapse" within the meaning of sec. 788.04, STATS., in that the parties had reached an impasse regarding the designation of an arbitrator for Lloyd's.

Lloyd's appealed the decision of the circuit court to the court of appeals. Wausau filed a motion to dismiss the appeal on the grounds that the circuit court's December 23 order was not a final appealable order. On March 19, 1993, the court of appeals, declining to rule on the finality question, granted a discretionary appeal pursuant to sec. 808.03(2), STATS.[4] The court of appeals also granted Lloyd's request for a stay of arbitration pending appellate consideration of the case. The court of appeals (Myse, J., dissenting) affirmed the order of the circuit court. The court concluded that the circuit court had the statutory authority to rule on Wausau's claims, *Employers Ins. of Wausau,* 178 Wis. 2d at 761–766, 505 N.W.2d at 150–52, and that the

[4] Section 808.03(2), STATS., provides:

A judgment or order not appealable as a matter of right under sub. (1) may be appealed to the court of appeals in advance of a final judgment or order upon leave granted by the court if it determines that an appeal will:

(a) Materially advance the termination of the litigation or clarify further proceedings in the litigation;

(b) Protect the petitioner from substantial or irreparable injury; or

(c) Clarify an issue of general importance in the administration of justice.

circuit court did not erroneously exercise its discretion by confirming the appointment of Mitchell as Lloyd's party arbitrator, *id.* at 766–69, 505 N.W.2d at 152–54. Lloyd's then petitioned for and was granted review in this court.

■■■

Our discussion in this case necessarily begins with a consideration of the concept of arbitration. Corpus Juris Secundum provides the following definition:

> Broadly and generally speaking an arbitration is a contractual proceeding by which the parties to a controversy or dispute, in order to obtain a speedy and inexpensive final disposition of the matters involved, voluntarily select arbitrators or judges of their own choice, and by consent submit the controversy to such tribunal for determination in substitution for the tribunals provided by the ordinary processes of the law.

6 C.J.S. *Arbitration* § 2 (1975); *see also Stradinger v. City of Whitewater,* 89 Wis. 2d 19, 31, 277 N.W.2d 827, 831 (1979) (arbitration is ordinarily understood to refer to a proceeding voluntarily undertaken by parties who want a dispute determined on the merits by a decision maker of their choice). Arbitration is essentially contractual, AT&T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 648 (1986), and its basic tenet is that of avoiding the courts in resolving the dispute at issue. *Mercury Oil Refining Co. v. Oil Workers International Union, CIO,* 187 F.2d 980, 982 (10th Cir. 1951); *see also City of Madison v. Frank Lloyd Wright Foundation,* 20 Wis. 2d 361, 383, 122 N.W.2d 409, 421 (1963) ("purpose of arbitration is to substitute a less-expensive and less-formal method of settling differences between parties for normal court litigation"). The conclusion that one draws from these

assertions is that arbitration is meant to be a swift and inexpensive process that is guided by a contractual agreement.

In Wisconsin, ch. 788, STATS., sets out the parameters for an arbitration proceeding.[5] Section 788.01, STATS., for instance, recognizes that arbitration clauses in contracts "shall be valid, irrevocable and enforceable." Further, sec. 788.03, STATS., states that a "party aggrieved by the alleged failure, neglect or refusal of another to perform under a written agreement for arbitration, may petition any court of record having jurisdiction of the parties or of the property for an order directing that such arbitration proceed as provided for in such agreement." Section 788.03 also sets forth the procedure for resolving issues of noncompliance with an arbitration agreement and gives the circuit courts the authority to order and direct the parties "to proceed with the arbitration in accordance with the terms thereof."[6] Finally, as relevant to this case, sec. 788.04,

---

[5] The parties recognize that the federal statutes on arbitration are substantively identical to the Wisconsin statutes on arbitration. Sections 788.03 and 788.04, STATS., for instance, are patterned after sections 4 and 5 of the United States Arbitration Act respectively. Thus, although our review involves only a consideration of the Wisconsin statutes on arbitration, nonetheless, we may also consider federal court interpretations of the federal statutes on arbitration as an aid in the resolution of this case. *See Milwaukee Police Ass'n v. City of Milwaukee*, 92 Wis. 2d 145, 164, 285 N.W.2d 119, 128 (1979).

[6] Section 788.03, STATS., provides in full:

**Court order to arbitrate; procedure.** The party aggrieved by the alleged failure, neglect or refusal of another to perform under a written agreement for arbitration, may petition any court of record having jurisdiction of the parties or of the property for an order directing that such arbitration proceed as provided for in such agreement. Five days' notice in writing of such application shall be

Stats., sets out the guidelines for the selection process of an arbitrator:

> **788.04 Arbitrators, how chosen. (1)** If, in the agreement, provision is made for a method of naming or appointing an arbitrator or arbitrators or an umpire that method shall be followed. If no method is provided in the agreement, or if a method is provided and any party thereto fails to make use of the method, or if for any other reason there is a lapse in the naming of an arbitrator or arbitrators or an umpire, or in filling a vacancy, then upon the application of either party to the controversy, the court specified in s. 788.02 or the circuit court for the county in which the arbitration is to be held shall designate and appoint an arbitrator, arbitrators or umpire, as the case or sub. (2) may require, who shall act under the agreement with the same force and effect as if specifically named in the agreement;

served upon the party in default. Service thereof shall be made as provided by law for the service of a summons. The court shall hear the parties and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. If the making of the arbitration agreement or the failure, neglect or refusal to perform the same is in issue, the court shall proceed summarily to the trial thereof. If no jury trial is demanded the court shall hear and determine such issue. Where such an issue is raised, either party may, on or before the return day of the notice of application, demand a jury trial of such issue, and upon such demand the court shall make an order referring the issue to a jury called and impaneled as provided in s. 756.096. If the jury finds that no agreement in writing for arbitration was made or that there is no default in proceeding thereunder, the proceeding shall be dismissed. If the jury finds that an agreement for arbitration was made in writing and that there is a default in proceeding thereunder, the court shall make an order summarily directing the parties to proceed with the arbitration in accordance with the terms thereof.

and, except as provided in sub. (2) or unless other-
wise provided in the agreement, the arbitration
shall be by a single arbitrator.

Lloyd's asserts that, under these statutes, the circuit
court in the present case had no authority to entertain
Wausau's claims for relief. We disagree.

██

This case requires us to consider various provi-
sions of the Wisconsin Arbitration Act as set forth in ch.
788, STATS. Statutory construction is a question of law
that we review *de novo. In re J.A.L.,* 162 Wis. 2d 940,
962, 471 N.W.2d 493, 502 (1991); *Tahtinen v. MSI Ins.
Co.,* 122 Wis. 2d 158, 166, 361 N.W.2d 673, 677 (1985).
The factual findings as made by the trial court, how-
ever, will not be disturbed unless they are found to be
clearly erroneous. *See* sec. 805.17(2), STATS.

At the outset, we recognize that the courts of this
state must act with extreme care when they become
involved in an arbitration proceeding. After all, a fun-
damental tenet of arbitration is that of avoiding the
court system. Thus, we condone an approach that
attempts minimal interference in the arbitration pro-
cess. Nonetheless, when a case, like the one at hand,
demands that intervention be made, the circuit courts
have the power to act. This authority is derived directly
from the statutes. As noted above, sec. 788.03, STATS.,
specifically provides that where a party is aggrieved by
another's failure, neglect or refusal to perform under a
written arbitration agreement, a circuit court can order
the arbitration to proceed according to the agreement's
terms. Thus, the legislature has recognized that in
some instances a party may attempt to avoid the effects
of an arbitration agreement, and that the courts may
need to step in to enforce an agreement as drafted. This
enforcement power is not without bounds, however. On

613

the contrary, the statutes clearly delineate what a circuit court may do, as well as the procedures that it must utilize. For instance, an aggrieved party must file a petition for an order directing that arbitration proceed. Section 788.03, STATS. Further, the allegedly noncompliant party may request either a bench or jury trial to resolve the issues at hand. *Id.* In sum, the statutes provide a manner to bring the parties together in a formal situation where they are afforded an opportunity to be meaningfully heard.

Lloyd's contends that sec. 788.03, STATS., should be read narrowly to mean that a circuit court may only address the issues of whether an arbitration agreement exists between the parties and whether a party has refused or neglected to proceed with arbitration.[7] Because it never disputed the fact that an arbitration agreement existed between the parties and because it never refused or neglected to proceed with arbitration, Lloyd's posits that the circuit court had no reason to become involved in the dispute. Consequently, Lloyd's argues that the issues concerning its compliance with the timeliness of its arbitrator designation, the qualifi-

---

[7] Lloyd's cites several cases from the United States Court of Appeals, Second Circuit, as supporting this proposition. *Conticommodity Services Inc. v. Philipp & Lion,* 613 F.2d 1222, 1226 (2nd Cir. 1980) (action under FAA § 4 raises only two questions—whether an arbitration agreement exists and whether the failure, neglect or refusal of one party to arbitrate is in dispute); *Trafalgar Shipping Co. v. International Milling Co.,* 401 F.2d 568, 571 (2nd Cir. 1968); *World Brilliance Corp. v. Bethlehem Steel Co.,* 342 F.2d 362, 364–65 (2nd Cir. 1965). We reject the Second Circuit's reading of § 4 of the Federal Arbitration Act as being too narrow for purposes of the corresponding Wisconsin Arbitration provision—sec. 788.03, STATS.

cations of the arbitrator and whether the arbitrator was biased should not have been addressed by the circuit court. Lloyd's argument assumes too much. While there is no dispute that an arbitration agreement existed between the parties, the facts indicate, Lloyd's protestations to the contrary notwithstanding, that Lloyd's did refuse or neglect to proceed to arbitration in a timely manner. At the very latest, Lloyd's received notice from Wausau that it was demanding arbitration for a resolution of the dispute on June 6, 1991. Lloyd's, however, did not name an arbitrator until July 22, 1991. The arbitration agreement clearly states that Lloyd's party arbitrator was to be named within 30 days of its having received notice from Wausau. Thus, even under Lloyd's narrow view of the reach of sec. 788.03, STATS., the circuit court had the authority to step in and order that arbitration proceed according to the terms of the agreement because Lloyd's had either refused or neglected to appoint an arbitrator within the parameters of the agreement.

██

Further support for the conclusion that the circuit court had the authority to act in this case is found in sec. 788.04, STATS. That statute specifically addresses the problems of arbitrator appointment. Under sec. 788.04, where the method for naming or appointing an arbitrator is set forth, that method is to be followed. If, however, one of the parties to the agreement at issue has failed to make use of the method of appointment, or if for any other reason there is a lapse in the naming of an arbitrator, then the circuit court has the authority to designate and appoint an arbitrator. As noted above, Lloyd's failed to make use of the arbitration agreement's method of appointing its arbitrator, i.e., it did not name an arbitrator within the 30-day window as

delineated in the agreement. Consequently, the circuit court had the authority to designate or appoint an arbitrator of its own choosing under sec. 788.04. Although it was under no statutory duty to name Mitchell as Lloyd's arbitrator, by doing so, the circuit court gave deference to the arbitration agreement pursuant to sec. 788.03, STATS. As the circuit court recognized, the parties had previously signed an agreement whereby Wausau could appoint Lloyd's arbitrator if Lloyd's neglected to do so within 30 days. In cases such as these, we recommend that circuit courts act pursuant to sec. 788.03 and allow the contractual provisions of the arbitration agreement to control.

Lloyd's argues that even assuming the 30-day period did indeed lapse under the terms of the arbitration agreement, that lapse is irrelevant because the agreement contains no "time is of the essence" type language. Therefore, Lloyd's posits that its appointment of Hall as its party arbitrator beyond the 30-day time period did not constitute a breach of the agreement allowing Wausau to name Lloyd's arbitrator. Whether "time is of the essence" of a contract is a question of fact. *See Buntrock v. Hoffman,* 178 Wis. 5, 13, 189 N.W. 572, 574–75 (1922). Where the circuit court is sitting as the fact finder, this court will not set aside its factual findings unless those findings are clearly erroneous. Section 805.17(2), STATS. During the December 23, 1992 motion hearing, the circuit court stated: "I am going to make a finding of fact that time is of the essence in this matter. I am going to make time of the essence as a finding based on the factual background of this case . . .."

This court set out the standard for consideration of whether time is of the essence of a contract over 70 years ago:

> In the absence of express language making time the essence of the contract, it is sometimes difficult to determine whether it was the intention of the parties to make time of the essence or not; it then oftentimes becomes necessary to consider the surrounding facts and circumstances, the situation of the parties, and the acts of the parties with respect to the subject matter. Each case must be decided upon its own circumstances. Although time is originally of the essence of the contract, a strict performance may be waived.
>
> "The subsequent conduct of the parties may also amount to a construction by them of the original contract, and show that they understood and regarded that time was or was not of its essence."

*Buntrock,* 178 Wis. at 13, 189 N.W. at 574–75 (citation omitted). *See also Kubnick v. Bohne,* 56 Wis. 2d 527, 535, 202 N.W.2d 400, 404–05, (1972); *Long Investment Co. v. O'Donnel,* 3 Wis. 2d 291, 296, 88 N.W.2d 674, 677 (1958); *Zuelke v. Gergo,* 258 Wis. 267, 271, 45 N.W.2d 690, 692 (1951). What can be gleaned from this standard is that the importance of a specific time performance depends upon the terms in the contract as well as the circumstances appearing from the acts of the parties. Further, each case is to be determined according to the unique circumstances involved. *Kubnick,* 56 Wis. 2d at 536, 202 N.W.2d at 405; *Long Investment Co.,* 3 Wis. 2d at 296, 88 N.W.2d at 677.

The instant case clearly involves a provision that takes effect upon noncompliance with the stated 30-day time limit. The arbitration agreement provides: "If either party refuses or neglects to appoint an arbitrator

within 30 days after the receipt of written notice from the other party requesting it to do so, the requesting party may nominate two arbitrators, who shall choose the third." This adverse selection provision defines the result of failing to comply with the contractual time limit and makes time originally of the essence in this agreement.

■

We next look to whether the parties' subsequent conduct indicates an intent to waive strict performance of the time condition. Correspondence between the parties shows that Wausau believed time to be of the essence of the agreement. After receiving Wausau's arbitration notice, Lord, Bissell & Brook advised Wausau that it did not believe it had authority to accept notice on Lloyd's behalf. Wausau immediately responded that because Lord, Bissell & Brook had acted with both express and apparent authority in their prior dealings, a party arbitrator must be designated within 30 days of Wausau's original arbitration request. Nearly two months later, Lloyd's designated Hall as its party arbitrator. Wausau immediately responded that the "belated attempt at designation" was untimely. Wausau then proceeded under the terms of the agreement and designated Mitchell as Lloyd's party arbitrator. Wausau's conduct in this regard clearly evinced a belief that it considered time to be of the essence and that it would not, absent some agreement, waive strict compliance with the time condition in the agreement. Further, there is no indication that Lord, Bissell & Brook was not fully apprised of Wausau's stance on this issue. In sum, our review of the record leads us to conclude that the circuit court's

finding that time was of the essence of the arbitration agreement was not clearly erroneous.[8]

This conclusion is in line with a recent federal court of appeals decision considering essentially the same issue—*Universal Reinsurance Corp. v. Allstate Ins. Co.,* 16 F.3d 125 (7th Cir. 1994). In *Universal Reinsurance Corp.,* a dispute arose between the parties as to certain paid losses. *Id.* at 127. Allstate demanded arbitration of the dispute. *Id.* The arbitration provision, much like the one at issue here, provided:

> If any dispute arises between [the parties] with reference to the interpretation, performance, or breach of this Agreement (whether the dispute arises before or after termination of this Agreement) such dispute, upon the written request of either party, will be submitted to three arbitrators, one chosen by each party and the third by the two so chosen. If either party refuses or neglects to appoint an arbitrator within thirty (30) days after receipt of written notice from the other party requesting it to do so, the requesting party may appoint both arbitrators.

*Id.* at 126–27. Following Allstate's written demand for arbitration, Universal inadvertently failed to name an arbitrator within the 30-day time period. *Id.* at 127. Allstate exercised its contractual prerogative and appointed an arbitrator on Universal's behalf. *Id.* Universal objected and filed suit seeking confirmation of its own arbitrator selection. *Id.*

---

[8] The court of appeals upheld the circuit court's determination on this matter, pointing to the sophistication of the parties "who are well versed in the language and ramifications of contractual arbitration provisions." *Employers Ins. of Wausau,* 178 Wis. 2d at 767, 505 N.W.2d at 153.

The district court granted Universal's confirmation request and denied Allstate's counterclaim requesting confirmation of its choice of an arbitrator on behalf of Universal. *Id.* Allstate appealed and the court of appeals reversed. *Id.* at 128–30. The court explained:

> [A]s with any other contract, the written arbitration agreement itself is the best evidence of what the parties intended. In this case the agreement is crystal clear, specifying a particular course for the appointment of a second arbitrator when one of the parties fails to make its selection within thirty days. This provision does not command less deference simply because it concerns a procedural rather than a substantive aspect of the parties' decision to arbitrate. On the contrary, the Arbitration Act states in no uncertain terms that contractual provisions for the appointment of an arbitrator *"shall* be followed." 9 U.S.C. § 5 (emphasis supplied).

*Id.* at 129 (citation omitted). The court further noted that because the parties had mutually agreed to a binding procedure that sought to eliminate needless delays in the selection of arbitrators, it would be inappropriate for the court to rewrite the agreement. *Id.* at 130; *see also Evanston Ins. Co. v. Gerling Global Reinsurance Corp.,* 1990 WL 141442, *2 (N.D. Ill. 1990) (court strictly construed arbitration agreement concerning the untimely appointment of a party arbitrator).

Our conclusion that the circuit court had the statutory authority to act in this case, and that time was of the essence of the contract, has assumed to this point that Lord, Bissell & Brook had either the express or apparent authority to accept notice on behalf of Lloyd's. During the December 23, 1992, hearing, the circuit court made a finding of fact that Lord, Bissell & Brook "were the agents of Lloyd's for purposes of notice under

these circumstances and the circumstances of this case as appears in the record." Our review of this finding is again guided by sec. 805.17(2), STATS., viz., factual findings of the trial court will not be disturbed unless they are clearly erroneous.

An attorney, or his or her respective law firm is not deemed an agent of the client so appointed absent a factual basis for such belief. *New England Reinsurance Corp. v. Tennessee Ins. Co.,* 780 F. Supp. 73, 78 (D. Mass. 1991). " 'The requisite intent, however, may be implied by the . . . broad circumstances surrounding the service upon the agent.' " *Id.* (citing A. Wright and C. Miller, Federal Practice and Procedure, sec. 1097 at 86–87 (2d ed. 1987). Where there is an implication that an attorney is authorized to receive process on behalf of the client "it must be implied from all the circumstances . . . which indicate the extent of the authority the client intended to confer." *United States v. Bosurgi,* 343 F. Supp. 815, 818 (S.D.N.Y. 1972); *see also United States v. Balanovski,* 236 F.2d 298, 303 (2nd Cir. 1956), *cert. denied,* 352 U.S. 968 (1957).

The record contains no contract between Lord, Bissell & Brook and Lloyd's as to the specific or express authority of Lord, Bissell & Brook to accept notice of arbitration on behalf of Lloyd's. This fact, however, is not dispositive. The record as a whole clearly points to the conclusion that Lord, Bissell & Brook had the apparent authority to accept notice in this case. First, it is beyond question that Lord, Bissell & Brook was retained to defend Lloyd's against the claims asserted by Wausau. This is evident in the August 22, 1988, letter where Attorney Dempsey asserted that "this firm represents the interests of the London Excess of Loss

Retrocessional Reinsurers [Lloyd's]." Further, the law firm itself was the entity engaged in the auditing of Wausau's claims, a process that took several years to complete. At the end of this audit, it was Lord, Bissell & Brook that informed Wausau of Lloyd's denial of the claims. Moreover, Wausau essentially had all of its communications regarding the claims at issue with representatives from Lord, Bissell & Brook. In sum, the trial court considered all of the circumstances surrounding the apparent authority of Lord, Bissell & Brook to receive process on behalf of Lloyd's and its ultimate factual finding on this matter cannot be deemed to have been a clearly erroneous determination.

*By the Court.*—The decision of the court of appeals is affirmed.